**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CARLTON LANE,

      Plaintiff,

          v.

JOSEPH F. TAVARES, M.D., *et al.*,

      Defendants.

CIVIL ACTION NO. 3:CV-14-991

(JUDGE CAPUTO)

(MAGISTRATE JUDGE SCHWAB)

## MEMORANDUM

Presently before me is Plaintiff Cartlon Lane's ("Lane") Motion for Preliminary Injunction. (Doc. 55.) Lane, an inmate currently housed at the State Correctional Institution at Huntingdon, Pennsylvania ("SCI-Huntingdon"), commenced this action in May 2014 alleging a number of claims involving religious and disability discrimination.  In litigating these claims, Lane contends that his constitutional right to access to the courts has been infringed because he has been denied confidential contact visits with his counsel, meaning he is not permitted to meet with his counsel in a private room without being separated by a barrier.  Lane thus seeks a preliminary injunction to enjoin SCI-Huntingdon from denying him confidential contact visits with his attorney and to prepare space suitable to accommodate such visits.  Because Lane fails to demonstrate a reasonable probability that he will succeed on the merits of his access to the courts claim or that he will suffer irreparable harm in the absence of preliminary injunctive relief, a preliminary injunction will not issue and Lane's motion will be denied.

### I. Background

**A.      Relevant Procedural Background**

Lane commenced this action against five individuals and the Pennsylvania Department of Corrections ("DOC") on May 23, 2014.  Lane, represented by counsel, alleges that he was deprived of his constitutional rights under the First, Eighth, and

Fourteenth Amendments to the United States Constitution. (*Compl.*, Counts I-IV.)  Lane also alleges violations of the Religious Land Use and Institutionalized Persons Act, the Americans with Disabilities Act, and the Rehabilitation Act. (*Id.* at Counts V-VII.)  The action was referred to Magistrate Judge Susan E. Schwab for pretrial management.

On August 15, 2014, Defendant Dr. Joseph Tavares moved to dismiss Lane's Complaint. (Doc. 23.)  And, on August 20, 2014, Defendants Paula Price, Tabb Bickell, Mr. Cook, Christopher Oppman, and the DOC (collectively, "Commonwealth Defendants") filed a motion for judgment on the pleadings. (Doc. 25.)  Thereafter, Commonwealth Defendants filed a "Motion to Correct the Record and Refile Briefs" associated with their motion for judgment on the pleadings. (Doc. 58.)  Commonwealth Defendants subsequently filed a praecipe to withdraw their motion for judgment on the pleadings, (Doc. 94), which was granted on January 27, 2015, (Doc. 101), and a motion for summary judgment. (Doc. 95.)  The outstanding motion to dismiss and motion for summary judgment are referred to Magistrate Judge Schwab.

On November 13, 2014, Lane filed the instant Motion for Preliminary Injunction and supporting brief. (Docs. 55; 56.)  Because a magistrate judge may not issue a dispositive order on a motion for preliminary injunction absent consent of the parties, *see* 28 U.S.C. §§ 636(b)(1)(A), (c)(1), I retained jurisdiction over Lane's request for preliminary injunctive relief.

In his motion for a preliminary injunction, Lane seeks "to enjoin SCI Huntingdon from denying him confidential contact visits with his attorney." (Doc. 56, 1.)  Specifically, Lane asserts that his constitutional right to access to the courts includes the right to "contact visits" with his attorney, meaning that he is entitled to meet with his counsel in private without being separated by barriers.  According to Lane, "SCI Huntingdon allows only two kinds of attorney visits: (1) a contact visit while seated in the midst of other visitors and

prisoners in the common visiting room, or (2) a non-contact visit in one of three booths that open off of the common visiting room." (Doc. 56, 3.)  Under either option, Lane contends that his ability to communicate privately with his attorney is compromised. (*Id*.)

## B.   Preliminary Injunction Hearing

A hearing was held on Lane's motion for a preliminary injunction on November 25, 2014.   At the outset of the hearing and prior to the presentation of any evidence, Commonwealth Defendants made several challenges to Lane's motion on subject-matter jurisdiction grounds.   In particular, Commonwealth Defendants argue that the  underlying lawsuit in this case relates to allegations of disability and religious discrimination, (*Tr. Prelim. Inj. Hr'g* ("*Tr.*"), 3:25-4:1), but the motion for a preliminary injunction implicates a right of access to the courts claim, a cause of action for which he had yet to fully exhaust under the Prison Litigation Reform Act. (*Id*. at 4:15-22.) I took Commonwealth Defendants' jurisdictional arguments under advisement and allowed the parties to present evidence on Lane's motion.

Three witnesses testified at the November 25, 2014 hearing.  Lane was the first witness to testify.  Lane indicated that he is currently a security Level 4 inmate housed in general population. (*Tr.*, 18:6-9.)

Lane first testified as to the process and procedure he goes through before and after receiving a visitor.  After receiving a pass, Lane testified that he goes to central control before going to the dressing room area. (*Id*. at 21:21-25.)  There, he changes from his institutional browns into visiting clothing, which is a brown jumpsuit. (*Id*.)  He is strip-searched at that time. (*Id*. at 22:8-17.)  After changing, he then enters the visiting area and reports to the officer's desk. (*Id*. at 22:17-19.)  At the conclusion of a visit, he goes back to the dressing area, where he is again strip-searched before getting dressed in his institutional clothing. (*Id*. at 23:8-12.)  Only one inmate is allowed at a time in this search

3

area, and if an inmate wants to return when the room is occupied, he has to wait in a seating area in the visiting room. (*Id*. at 23:21-24:6.)

Lane also testified about the accommodations available to meet with his attorney at SCI-Huntingdon.  According to Lane, one location in which he is permitted to visit with his attorney is at a round game table[1] in the visiting area. (*Id*. at 22:22-23:1.) Lane testified that the seating area where inmates can wait to get back to the dressing area is approximately four or five feet from the game table. (*Id*. at 24:7-9.)  The game table is also approximately four or five feet from the restrooms that visitors use, the doors that visitors enter by, and the water fountain that visitors use. (*Id*. at 24:10-18.)  Further, the game table is only about five to six feet from the officer's desk, and the officer's desk has recently been expanded to take up more of the visiting area. (*Id*. at 25:18-26:11.) Lane finds meeting with his counsel at the game table unsatisfactory because of the lack of privacy. (*Id*. at 24:19-22.)  Lane also testified to concern that security cameras can focus on any materials that are placed on the game table. (*Id*. at 25:2-5.)  Moreover, the visiting room is very loud, requiring Lane and his attorney to yell to each other. (*Id*. at 25:6-17.)

In addition to the game table, Lane testified that there are some small "non-contact booths" off the visiting room. (*Id*. at 26:12-23.)  The booths have doors on them, and there is glass in the doors. (*Id*. at 27:1-6.)  These doors are about three feet away from the officer's desk. (*Id*. at 27:7-9.)

Lane also testified that he had a visit with counsel among the regular visitors in the visiting area. (*Id*. at 27:19-22.)  This was in a small area in the back of the visiting room that is for children. (*Id*. at 27:24-28:5.)  Lane did not find the meeting with counsel in the children's area satisfactory because of his concerns about confidentially. (*Id*. at 28:6-13.)

---

[1]     This table was also referred to during the preliminary injunction hearing as the handicapped table. (*Tr.*, 130:1-7.)

In sum, Lane testified that the lawsuit in this action involves sensitive medical issues which he is uncomfortable talking about under the accommodations presently available at SCI-Huntingdon. (*Id*. at 28:14-20.)

The second witness to testify at the November 25, 2014 hearing was Brian Harris ("Harris"). Harris is employed by the DOC as a captain, Corrections Officer IV, and is currently assigned to oversee the security office at SCI-Huntingdon. (*Id*. at 47:18-23.) In that position, Harris oversees the general security and operation of the facility, including the introduction of contraband, escapes, and security over the perimeter and the institution. (*Id*. at 47:24-48:3.) As part of his job, Harris testified that he has to analyze all areas of the institution for weaknesses, and his analysis of SCI-Huntingdon includes the visitation area. (*Id*. at 48:7-11.) Harris indicated that the visitation area poses concerns relating to inmate escapes, safety of the public, security of the inmates, and introduction of contraband. (*Id*. at 48:12-18.) Harris noted that in the visitation area at SCI-Huntingdon there have been inmate assaults on visitors, as well as visitor assaults on inmates. (*Id*. at 49:3-5.)

Harris further testified that the visitation room is one of the thoroughfares for the introduction of contraband to the facility. (*Id*. at 49:6-50:3.) Harris estimated that contraband is introduced into the visiting room on a weekly basis, and sometimes as many as multiple times in one day. (*Id*. at 50:4-9.) According to Harris, contraband can be passed from a visitor to an inmate in the visiting room by various means, such as placement in the hand, kissing, and by way of food purchased in the visiting room. (*Id*. at 51:1-52:4.)

On cross-examination, Harris testified as to the procedure by which an attorney must go through prior to entering the visiting room. Generally, the attorney would be added to the visiting room list by the inmate prior to the visit. (*Id*. at 64:6-9.) When the attorney comes to see the inmate, if the attorney arrives in an automobile, it is subject to inspection. (*Id*. at 66:12-20.) Next, the attorney must stop at the outside visiting area where she is

given a pass, has her hand stamped, and is given a wrist band. (*Id*. at 65:1-15.)  The bracelet tag and hand stamp were implemented in the 1990s after an escape occurred where an inmate and visitor switched clothing. (*Id*. at 67:1-16.)  The attorney must also fill out the sign-in log and provide two forms of identification. (*Id*. at 65:16-24.)  The attorney then goes to a gate that is locked and controlled by a sergeant. (*Id*. at 67:22-2.)  After going through the gate, the visitor's hand is checked for the stamp and she then passes through a metal detector. (*Id*. at 68:5-10.)  The visitor will next go through a second gate and will routinely, but not always, be scanned for drugs. (*Id*. at 68:12-25.)  Thereafter, if the visitor passes the drug scan, she would come to a third locked gate. (*Id*. at 70:15-22.)  At that point, the sergeant at the front gate would let her into the visiting room area, and she would report to the visiting room officer. (*Id*. at 70:19-71:2.)  The visitor would exit the same way in reverse order at the conclusion of the visit. (*Id*. at 71:4-16.)

Harris also testified about the layout of the "non-contact booths" or "attorney rooms" at SCI-Huntingdon.  According to Harris, there are three rooms that are separated by a plexiglass barrier in the middle. (*Id*. at 91:18-23.)  Inmates enter the rooms from the dressing area, while visitors enter their side of the booths from the visiting area. (*Id*.)  Two of the three booths have larger windows in the door, while the third booth has a smaller window. (*Id*. at 93:17-20.)  Although separated by the barrier, inmates and their attorneys or visitors can communicate through a telephone or by talking through the barrier. (*Id*. at 91:18-23.)  Harris testified that the telephones in all the booths work and he has not received any complaints that they are not in working condition, but he has not personally verified that they function properly. (*Id*. at 100:4-25.)  Harris also indicated that sound-dampening barriers have been added to the booths. (*Id*. at 88:9-10, 99:16-18.)

If an attorney and inmate meet in one of the booths and they need to share or pass documents, the documents are taken by a staff member from one side of the booth to the

other. (*Id*. at 91:24-93:16.)

With respect to inmate visits by attorneys at SCI-Huntingdon, there are no limits on the number of visits an inmate can have from an attorney. (*Id*. at 56:7-9.)  Similarly, time limits are not placed on attorney visits. (*Id*. at 92:16.)  And, there are no restrictions on how many inmates a particular attorney may visit. (*Id*. at 64:21-23.)

The final witness to testify at the preliminary injunction hearing was Ronald David Smith ("Smith").  Smith has been employed by the DOC for over twenty-six years, and his job title is Corrections Officer IV, which is a captain. (*Id*. at 103:20-104:1.)  Smith is currently assigned as the alternate shift commander, and his duties include the overall security of SCI-Huntingdon, including the visitation area. (*Id*. at 104:2-13.)  In the visiting area, there is generally one Corrections Officer I assigned to the dressing area, one Corrections Officer I assigned to the main inside visiting area, and one Corrections Officer II assigned to the outside visiting room. (*Id*. at 104:14-23.)  And, if the inside visiting area is crowded, an additional Corrections Officer I may be assigned to that room. (*Id*.)

With respect to the attorney rooms or non-contact booths, Smith testified that each of the three rooms are approximately ten feet by ten feet. (*Id*. at 107:16-23.)  The rooms are divided in half by a partition, and the partition is part plexiglass or lexan and the rest is solid metal. (*Id*.)  On both sides of the partition is a table, and there is also a seat on each side. Additionally, a telephone receiver is on both sides of the room. (*Id*.)  Commonwealth Defendants' Exhibits 5 and 6 were identified by Smith as pictures of the inside of attorney room 3. (*Tr.*, Exs. 5-6.)

These rooms are not monitored by cameras, and acoustic material has been added to the walls of attorney rooms 1 and 2 to reduce noise. (*Id*. at 108:19-109:5.)  However, the rooms are not completely soundproof in order to allow staff to hear if an emergency occurs. (*Id*. at 109:6-19.)  Staff generally keeps visitors and inmates from lingering near the

7

entrances to the attorney rooms. (*Id*. at 109:20-110:5.)

The officer on duty is required to monitor the activity in these booths by walking around and observing the rooms to ensure the safety of visitors and inmates. (*Id*. at 110:10-18.)  While it is possible to see in room 2 from the officer's station, it is not possible from that location to view into rooms 1 and 3. (*Id*. at 110:19-111:5.)  Smith also testified about the recent modifications to the officer's desk to enhance an officer's ability to observe the inside visiting area. (*Id*. at 112:10-113:1.)

Smith further testified about efforts he made to address Lane and his counsel's concerns about privacy during their meetings.  According to Smith, Lane and his counsel were offered to have a contact visit in the handicapped visiting area (the game table), in the general area of the visiting room, or in the back of the visiting room because no children were visiting at that time. (*Id*. at 113:8-114:9.)  The handicapped visiting area, Smith stated, is approximately ten to fifteen feet from the officer's desk, while the table in the children's area is over fifty feet away from the officer's station. (*Id*. at 114:14115:2.)

Smith also indicated that Lane and his counsel were provided the option of meeting in a non-contact booth. (*Id*.)  Smith testified that attorneys can share documents with their clients while meeting in the non-contact booths as material can be passed back and forth by staff members. (*Id*. at 115:23-116:13.)   While SCI-Huntingdon staff used to pass documents between attorneys and inmates upon request, the policy has changed to allow passing of paperwork only every fifteen minutes in response to Lane's counsel's practice of "hand[ing] one sheet of paper to the officer at a time, to hand to her client." (*Id*. at 117:10-22.)  Smith testified that all attorneys and inmates are treated the same way, and papers cannot be passed more frequently because staff members are not watching other inmates in the visiting area when they pass documents from attorney to inmate. (*Id*. at 117:23-118:7.)  With respect to removing the partition in the non-contact booths, Smith testified that

would provide an avenue for the introduction of contraband into the facility without being observed by staff. (*Id*. at 120:1-7.)  Similarly, if visitors were allowed to sit on the same side of the partition with an inmate, this would increase the opportunity for the introduction of contraband, as well as place the visitor at risk. (*Id*. at 120:11-18.)

Smith was also asked to identify five photographs depicting the visitation area at SCI-Huntingdon. (*Tr.*, Exs. 14-18.)  As indicated by Smith's testimony on cross-examination and these exhibits, next to the visitor's entrance to the visitation area is a coatrack, and beyond the coatrack is the handicapped table. (*Tr.*, 130:8-19.) Another coatrack is on the other side of the handicapped table.  On top of that coat rack are various board games for inmates and visitors to use during visits. (*Id*. at 131:7-18.)  Beyond that coatrack is a cabinet and the officer's station, and past the officer's station is the general seating area. (*Id*. at 138:7-14.) Smith testified that the general seating area could accommodate eighty to a hundred individuals at one time. (*Id*. at 138:21-139:12.)

On the opposite side of the visiting room from the coatrack with the games is a drop-down background panel, which is used for taking pictures with visitors. (*Id*. at 131:19-132:9.)  The entrance to attorney room 2 is on one side of the drop-down panel and is across and off to the side of the officer's station. (*Id*. at 136:9-17.) On the opposite side of the drop-down panel is the door to the dressing area from which inmates enter and exit the visiting room. (*Id*. at 133:14-20.)  This is also the door which inmates must use if they have to use the restroom while they have a visitor. (*Id*.)  Beside the door to the dressing area are four chairs. (*Id*. at 133:21-134:9.) Although Smith testified that inmates or visitors waiting to use the restroom or get into the visiting area are told to wait in the general visiting area and not the chairs, (*id*. at 134:1-135:17), Exhibit 17 depicts individuals in those seats. (*Tr.*, Ex. 17.) On the other side of the chairs is attorney room 1, which has a window in the door that goes halfway to the floor. (*Tr.*, 135:19-24.)  Beneath the window are ventilation holes, which

Smith testified that he believed were still open. (*Id*. at 135:23-136:6.)  On the other side of attorney room 1 is the female visitor's bathroom. (*Id*. at 136:18-137:2.)

In addition to the testimony of Lane, Harris, and Smith and the previously referenced photographs, a copy of DC-ADM 812, entitled "Inmate Visiting Privileges," was admitted into evidence at the preliminary injunction hearing. (*Tr.*, Ex. 1.)  The policy provides that "[a]n inmate in general population will be permitted contact visits in a relaxed setting, under supervision of the assigned Correctional Officer(s)." (*Id*. at § 1.A.1.)  A "contact visit" is defined in DC-ADM 812 as "[v]isits in a setting in which the inmate and visitor are permitted limited physical contact and are not separated by security barriers or control systems." (*Id*. at Glossary.)  DC-ADM 812 also provides that "[t]he confidentiality of the attorney-client relationship will be honored.  Personnel will not be stationed in such a manner as to be able to overhear normal conversation." (*Id*. at § 2.B.3.a.)  Further, attorneys "are subject to the same rules and regulations as other visitors." (*Id*. at § 2.B.3.c.)

At the conclusion of the preliminary injunction hearing, the parties were granted the opportunity to file post-hearing briefs.  Commonwealth Defendants timely filed their brief in opposition to the motion for preliminary injunction on December 16, 2014, (Doc. 86), and Lane timely filed his reply brief in further support of his motion on December 30, 2014. (Doc. 92.)  Lane's motion for a preliminary injunction is now ripe for disposition.

## II. Legal Standard

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, - - - F.3d - - -, 2014 WL 7172253 (3d Cir. Dec. 17, 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)).  "Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing that the plaintiff is entitled to such relief.'" *Id*. (quoting *Winter*, 555 U.S. at 22, 129 S. Ct. 365).  "A plaintiff seeking a preliminary injunction must

10

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 129 S. Ct. 365.  The "failure to establish any element . . . renders a preliminary injunction inappropriate," *NutraSweet Co. v. Vit-Mart Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)), and the "movant bears the burden of showing that these four factors weigh in favor of granting the injunction." *Ferring Pharms., Inc v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citing *Opticians*, 920 F.2d at 192).  Furthermore, "where the relief ordered by the preliminary injunction is mandatory and will alter the *status quo*, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance, Grp.*, LLP, 528 F. 3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2nd Cir. 1995)).

### III. Discussion

As stated, Lane's motion for preliminary injunctive relief seeks "to enjoin SCI Huntingdon from denying him confidential contact visits with his attorney." (Doc. 56, 1.)  In opposing the motion, Commonwealth Defendants argue that the request for injunctive relief should be denied on either subject-matter jurisdiction grounds or on the merits.

Among other jurisdictional arguments raised by Commonwealth Defendants, they first contend that preliminary injunctive relief should be denied because Lane's claims in this case are based on religious and disability discrimination, but the request for a preliminary injunction involves an access to the courts claim that has yet to be fully exhausted. "Generally, an injunction should not issue if it 'is not of the same character, and deals with a matter lying wholly outside the issues in the suit.'" *Parker v. Adu-Tutu*, No. 10-2747, 2012 WL 3150092, at *2 (D. Ariz. Aug. 2, 2012) (quoting *Kaimowitz v. Orlando*, 122 F.3d 41, 43

(11th Cir. 1997)).  But, where the request for injunctive relief concerns a prisoner's access to the courts, "a nexus between the preliminary relief and the ultimate relief sought is not required." *Id*. (citing *Prince v. Schriro*, No. 08-1299, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009)); *see also Diamontiney v. Borg*, 918 F.2d 793, 796 (9th Cir. 1990) (where the preliminary injunction concerns the movant's access to the court, the merits of the underlying suit need not be considered).  Here, because Lane's request for preliminary injunctive relief implicates his right of access to the courts, a nexus between the preliminary relief and the ultimate relief sought in the underlying action is not needed.  Thus, Lane's request for preliminary injunctive relief relating to his access to the courts is properly considered in this litigation.

Commonwealth Defendants also argue that Lane's request for injunctive relief should be denied without a merits analysis because he does not seek to preserve the *status quo*. (Doc. 86, 2-3.)  In opposition, Lane contends that the *status quo* is "the last peaceable uncontested status existing between the parties before the dispute developed, not the situation on the day when suit was filed," and that his motion seeks to restore the *status quo* because before his counsel began to provide him with legal assistance, "every prisoner in general population was afforded contact visits with his attorney out of earshot of prison personnel" in accordance with DOC policy. (Doc. 92, 5-7.)  Lane argues that a preliminary injunction in this case "will restore the *status quo* by requiring the DOC to accommodate legal visits for Mr. Lane in the manner established by policy before he retained the services of his current counsel." (Doc. 92, 6-7.)

Here, the facts of record do not support a finding that Lane is seeking to preserve or restore the *status quo*.  For one, Lane fails to cites to any evidence in the record supporting the contention that every inmate in general population at SCI-Huntingdon was afforded contact visits with an attorney out of the earshot of prison personnel prior to his counsel

providing him legal assistance. (Doc. 92, 7.)  More significantly, however, in moving to enjoin Defendants to accommodate confidential contact visits with his counsel, Lane has not limited his request for relief to contact visits out of the earshot of prison personnel. Rather, he seeks to have Commonwealth Defendants "prepare space suitable for confidential contact attorney visits" at SCI-Huntingdon consisting of a "soundproof attorney conference" room that would allow for confidential contact visits between himself and his counsel. (Doc. 56, 15.)  During the preliminary injunction hearing, Lane's counsel similarly explained that she was looking for Commonwealth Defendants "to install [an] attorney facility" at SCI-Huntingdon. (*Tr.*, 75:22-23.)  As the record is devoid of evidence that attorneys were ever provided the use of a private conference room at SCI-Huntingdon, Lane's request for injunctive relief is not to preserve or restore the *status quo*.  Rather, Lane seeks affirmative relief in the form of the construction of an attorney conference room allowing for private contact, or "barrier-free," visits between inmates and attorneys.

Nonetheless, and Commonwealth Defendants' contention to the contrary notwithstanding (Doc. 86, 3-4), Lane is not barred as a matter of law from obtaining preliminary injunctive relief merely because he seeks to alter the *status quo*.  Mandatory preliminary injunctive relief may be granted in limited circumstances.  However, "[a] party seeking a mandatory preliminary injunction that will alter the *status quo* bears a particularly heavy burden in demonstrating its necessity," *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994), since "a mandatory injunction is an extraordinary remedy that is only granted sparingly by courts." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013); *see also Sovereign Order of St. John of Jerusalem Knights of Malta v. Messineo*, 572 F. Supp. 983, 988-89 (E.D. Pa. 1983) ("Mandatory preliminary injunctions, which seek to alter the *status quo*, are normally granted only in those circumstances where the exigencies of the situation demand such relief and the facts and the law are clearly in

13

favor of the moving party."). "Indeed, the moving party's 'right to relief must be undisputably clear.'" *Trinity Indus.*, F.3d at 139 (quoting *Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235, 1235, 93 S. Ct. 16, 34 L. Ed. 2d 64 (1972)).   Here, as Lane seeks mandatory preliminary injunctive relief, his motion is governed by this standard, and he therefore has a particularly heavy burden to meet in order to obtain a mandatory preliminary injunction.

As to the merits of Lane's motion for a preliminary injunction, it is well-settled that "prisoners have a constitutional right to access to the courts . . . ." *Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000) (citing *Bounds v. Smith*, 430 U.S. 817, 828, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977)).   "An inmate's right of access to the courts encompasses the right to contact visits with his or her attorney." *Young v. Larkin*, 871 F. Supp. 772, 783 (M.D. Pa. 1994) (citing, *inter alia*, *Ching v. Lewis*, 895 F.2d 608, 609 (9th Cir. 1990)); *Moore v. Lehman*, 940 F. Supp. 704, 708 (M.D. Pa. 1996).   However, "[c]ontact visitation with an attorney is merely one aspect of the broad and fundamental right of meaningful access to the courts." *Casey v. Lewis*, 4 F.3d 1516, 1523 (9th Cir. 1993).   Moreover, this right does not "entail unfettered or totally unrestricted visitation with counsel, for it must yield to legitimate penological interests." *Moore*, 940 F. Supp. at 708.[2]

---

[2]     In opposition to Lane's motion, Commonwealth Defendants contend that the access to the courts claim fails pursuant to *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996).  Specifically, Commonwealth Defendants argue that because none of the claims in the Complaint have been dismissed or rejected, Lane has not suffered or alleged any actual injury.  The Supreme Court has broadly identified two categories of access to the courts claims, "forward-looking and backward looking access claims." *See Christopher v. Harbury*, 536 U.S. 403, 412-15, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002).  "Backward-looking claims" arise when a plaintiff alleges that a specific claim "cannot now be tried (or tried with all material evidence)" because past official action "caused the loss or inadequate settlement of a meritorious case." *Id*. at 413-14, 122 S. Ct. 2179.  "Forward-looking claims," conversely, are those involving claims that "systematic official action frustrates a plaintiff . . . in preparing and filing suits at the present time," and the "essence of [the forward-looking] access claim is that official action is presently denying an opportunity to litigate for a class of potential

At issue here is whether Lane is entitled to preliminary injunctive relief on his claim that his right of access to the courts has been infringed by Commonwealth Defendants.  As set forth above, to obtain a preliminary injunction, Lane must demonstrate that he is likely to succeed on the merits of his access to courts claim, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20, 129 S. Ct. 365.

First, Lane must demonstrate a likelihood of success on the merits to obtain preliminary injunctive relief.  In order to satisfy this element, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." *Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980).[3]

In *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The *Turner* Court identified four factors relevant to a determination of the reasonableness of a prison regulation: (1) whether a rational connection exists between the regulation and

---

plaintiffs." *Id*. at 413, 122 S. Ct. 2179.  Here, Lane's motion implicates a "forward-looking" access claim based on the contention that the denial of confidential contact visits is frustrating and denying him the ability to litigate the claims underlying this litigation.  Accordingly, it is proper to consider the merits of the preliminary injunction motion.

[3]   In analyzing this factor, Lane focuses on the likelihood of success on the merits of his underlying claims relating to religious and disability discrimination. (Doc. 92, 17-19.)  But, because his motion for a preliminary injunction relates to his access to the courts, I "need not consider the merits of the underlying complaint in considering whether to grant a preliminary injunction." *Prince v. Schriro*, No. 08-1299, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009) (citing *Diamontiney v. Borg*, 918 F.2d 793, 796 (9th Cir. 1990)); *see also Eldridge v. Ryan*, No. 13-888, 2014 WL 413158, at *2 (D. Ariz. Feb. 4, 2014).  Thus, at issue is Lane's likelihood of success on the denial of his access to the courts.

15

a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. *Id*. at 89-91, 107 S. Ct. 2254.

The Third Circuit has adopted a two-step analysis for determining whether a prison's regulation is reasonably related to a penological interest. "First, the prison has the burden of demonstrating the First *Turner* Factor. This burden is slight, and in certain instances, the connection may be a matter of common sense. Second, if the prison meets its burden under the First *Turner* Factor, then we consider the Other *Turner* Factors." *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012) (citation and internal citations omitted). Although the "'ultimate burden of persuasion with regard to the reasonableness of a regulation'" rests with the inmate, the prison must nevertheless "'put forward the legitimate governmental interest alleged to justify the regulation and demonstrate that the policy drafters could rationally have seen a connection between the policy and that interest.'" *Id*. (alteration omitted) (quoting *Jones v. Brown*, 461 F.3d 353, 360-61 (3d Cir. 2006)). Considering Lane's request for a preliminary injunction under this framework,[4] he fails to establish a reasonable probability that he will succeed on the merits of his access to the courts claim.

As to *Turner*'s first step, Commonwealth Defendants have identified several justifications for its regulation, namely, the safety and security of visitors, staff, and inmates, as well as preventing escapes and the introduction of contraband. Commonwealth Defendants have satisfied their slight burden by presenting evidence that the policy at issue is rationally connected to these interests. Specifically, Commonwealth Defendants

---

[4] The parties agree that the *Turner* factors govern the analysis of the regulation at issue. (Docs. 86, 15; 92, 20.)

16

presented testimony that the visiting area is a thoroughfare for the introduction of contraband to the facility, and allowing inmates and visitors, including attorneys, to have a contact visit in a private room or to sit on the same side of the partition in the non-contact booths could facilitate the entry of contraband into SCI-Huntingdon. (*Tr.*, 120:8-18.) Likewise, Commonwealth Defendants presented evidence that allowing inmates and their attorneys to have contact visits in a private room would jeopardize the safety of the attorney and staff members. (*Id.*) Furthermore, as a matter of "common sense," Commonwealth Defendants' policy with respect to denying confidential contact visits between attorneys and inmates serves the stated interests of protecting the safety of the public, inmates, and staff members, in addition to preventing the introduction of contraband to the facility. *See Jones*, 461 F.3d at 361 ("Whether the requisite connection may be found solely on the basis of 'common sense' will depend on the nature of the right, the nature of the interest asserted, the nature of the prohibition, and the obviousness of its connection to the proffered interest. The showing required will vary depending on how close the court perceives the connection to be.") Accordingly, Commonwealth Defendants have established a valid, rational connection between the regulation at issue and legitimate government interests for purposes of the instant motion. *Cf. Casey*, 4 F.3d at 1521 ("The ADOC's failure to specify a past event wherein a contact visit resulted in assault, escape, or hostage-taking, does not render irrational the adoption and implementation of a non-contact policy.").[5]

---

[5]     Thus, the circumstances here are unlike those in *Mann v. Reynolds*, 46 F.3d 1055 (10th Cir. 1995), a case relied on by Lane.  In *Mann*, the Tenth Circuit noted that "the record demonstrates a lack of rationality in the denial of contact between Inmates and their counsel" as inmates were permitted "unfettered personal contact with virtually all those with whom they interact ***except*** their lawyers." *Id*. at 1060 (emphasis in original).  That fact, coupled with the overlay of a "blanket adversarial" attitude between the defendants and inmates, suggested that "the limitation on contacts between lawyers and clients is not related to a legitimate penological interest." *Id*. at 1061.  The Tenth Circuit thus remanded to the district

Moving to *Turner*'s second step, consideration is first given to whether Lane has alternative means of exercising the asserted right. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Turner*, 482 U.S. at 90, 107 S. Ct. 2254 (citation and internal citation, quotations, and alteration omitted). But, "[w]ere it shown that no alternative means of [exercising the circumscribed right] existed . . . it would be some evidence that the regulations were unreasonable." *Overton v. Bazzetta*, 539 U.S. 126, 135, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003). Here, Lane is not denied "'all means of expression' of [his] right of meaningful access," *Casey*, 4 F.3d at 1522, as there is nothing in the record suggesting that he has been deprived of the use of an "adequate law library or adequate assistance from persons trained in the law." *Id*. Indeed, Lane has been able to meet with his counsel on numerous occasions, albeit in settings Lane and his counsel deem unsatisfactory. And, "[c]ontact visitation with an attorney is merely one aspect of the broad and fundamental right of meaningful access to the courts," *Casey*, 4 F.3d at 1523, and other avenues relating to the right of access remain available to Lane.

The next factor in *Turner*'s second step considers the burden on prison resources that would be imposed by accommodating Lane's request to have contact visits with his counsel in a private room. Although Commonwealth Defendants presented testimony that accommodating confidential contact visits would put a strain on prison personnel, (*Tr.*, 89:2-6), it is not clear from the present record whether such an accommodation would "have a significant 'ripple effect' on fellow inmates . . . ." *Turner*, 482 U.S. at 90, 107 S. Ct. 2254.

---

court with instructions to enter an order invalidating the restrictions on contact visits between the plaintiffs and their counsel. *See id*. at 1063-64. Here, however, Lane is not denied contact visits with his counsel, nor is there evidence of record that inmates are allowed unfettered personal contact in private with any visitors.

18

The final factor to consider under *Turner* is the existence of obvious, easy alternatives.  Here, Lane contends that because other DOC facilities permit confidential contact visits and the DOC policy provides for confidential attorney contact visits, this is evidence "that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Turner*, 482 U.S. at 90, 107 S. Ct. 2254.  However, although Lane argues in his submissions that other facilities provide attorney rooms allowing for confidential contact visits, (Doc. 56, 4 n.4), no evidence in the record confirms this statement.  Moreover, while Lane contends that DOC policy provides for confidential contact visits for inmates and attorneys, it is not apparent from the provisions in DC-ADM 812 relied on by Lane that such visits are to take place in a private room. (*Tr.*, Ex. 1., § 2.B.3.a. ("[t]he confidentiality of the attorney-client relationship will be honored.  Personnel will not be stationed in such a manner as to be able to overhear normal conversation.").)[6]  Furthermore, while the private attorney conference room Lane requests may be constructed at SCI-Huntingdon in the "direct line of sight from the officer's desk" (Doc. 56, 4) and "this proposal may suffice to stem the flow of contraband," "it fails adequately to address the potential problem[ ] of . . . injury to staff and visiting attorneys." *Casey*, 4 F.3d at 1523.  And, because Lane fails to point to an alternative that "fully accommodates [his] rights at *de minimis* cost" to security interests, *Turner*, 482 U.S. at 91, 107 S. Ct. 2254; *Casey*, 4 F.3d at 1523, SCI-Huntingdon's policy does not appear to be an exaggerated response in view of the existing record.

Upon consideration of the factors set forth by the Supreme Court in *Turner*, Lane fails to show a reasonable probability that he will prevail on the merits of his access to the courts claim.  As the record stands on the instant motion for a preliminary injunction, SCI-

---

[6]     Notably, "a prison policy manual does not have the force of law and does not rise to the level of a regulation. . . . Further, a violation of an internal policy does not automatically rise to the level of a Constitutional violation." *Atwell v. Lavan*, 557 F. Supp. 2d 532, 556 (M.D. Pa. 2007) (citation and internal citations omitted).

Huntingdon's policy appears to reasonably respond to legitimate institutional concerns posed by confidential contact visitation between an inmate and attorney in a private room: prevention of assault and the introduction of contraband. *See Casey*, 4 F.3d at 1523. Specifically, on the evidence of record, SCI-Huntingdon's policy has a rational connection to legitimate government interests and there has been no indication that obvious, easy alternatives exist to the policy that would accommodate Lane's request at *de minimis* costs. Balancing these factors with the lack of evidence regarding the policy's impact on others, and noting that Lane retains at least some access to the court, he fails to demonstrate a reasonable probability that he will succeed on his claim that the denial of contact visits with his attorney in a private room violates his constitutional right to access to the court.

Second, denial of Lane's motion for a preliminary injunction is also warranted because he has not demonstrated that he will suffer irreparable harm if the motion is denied. "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (citations omitted).

Here, Lane has not satisfied his burden of demonstrating that he will suffer irreparable harm if he is unable to have contact visits with his attorney in a private room. The testimony and exhibits admitted into evidence at the preliminary injunction hearing demonstrate that Lane and his counsel can speak confidentially during contact visits at SCI-Huntingdon. Specifically, Lane and his counsel are able to use the game table for contact visits. Although this table is in the general visiting area and Lane and his attorney may need to interrupt their conversations to maintain privacy when visitors, officers, or inmates approach, testimony presented at the hearing provided that this area is generally kept clear of other visitors and inmates. Moreover, while such an arrangement may not be ideal, SCI-

Huntingdon does not limit the length or number of visits between an inmate and attorney, thus minimizing any adverse impact caused by this arrangement.  And, even though Lane expressed concern that the security cameras could be used by the staff at SCI-Huntingdon to zoom in and read his legal materials, he did not substantiate that such a practice ever occurred, stating simply that prison officials could look at his material "if they choose to." (*Tr.*, 25:2-5.)

Likewise, the availability for Lane and his attorney to use the non-contact booths further counsel against finding that Lane will be irreparably harmed absent preliminary injunctive relief.  In those booths, Lane and his counsel are able to speak confidentially through telephones.  Likewise, there is soundproofing or acoustic material on the doors to reduce or dampen the noise escaping from those rooms.  And, even though Lane and his counsel are limited in their ability to pass documents back and forth in the non-contact booths, Smith testified that staff members pass paperwork between Lane and his attorney every fifteen minutes.  Furthermore, there is nothing in the record indicating that Lane's counsel is prevented from bringing an extra copy of any documents for Lane to use during a meeting which would reduce or eliminate the need to pass material back and forth. *Cf. United States v. Savage*, No. 07-550, 2012 WL 424993, at *5 (E.D. Pa. Feb. 10, 2012).

In view of Lane's ability to visit and communicate with his counsel, either in the non-contact booths or in the visitation area, I cannot say that he will suffer irreparable harm if he is not granted preliminary injunctive relief.  This is especially the case in an action such as this where Lane seeks to alter the *status quo* by obtaining mandatory preliminary injunctive relief.  As stated, in these circumstances Lane "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance, Grp.*, LLP, 528 F. 3d 176, 179 (3d Cir. 2008); *see also Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) ("[a] party seeking a mandatory preliminary

injunction that will alter the *status quo* bears a particularly heavy burden in demonstrating its necessity."). Lane has not satisfied his particularly heavy burden of demonstrating his need for a mandatory preliminary injunction. Accordingly, because Lane has not demonstrated that a reasonable probability exists that he will prevail on the merits of his claim or that he will suffer irreparable harm in the absence of preliminary injunctive relief, his motion will be denied without consideration of the remaining factors necessary to obtain a preliminary injunction. *See, e.g., In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir.1982) ("Thus, a failure by the moving party to satisfy these prerequisites: that is, a failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction."); *Shea v. Mountain View Sch. Dist.*, No. 14-1189, 2014 WL 3590006, at *6 (M.D. Pa. July 21, 2014).

In denying the preliminary injunction motion, I have afforded no weight to the testimony regarding the "suspicious" behavior of Lane's counsel. Specifically, at the hearing, Harris and Smith testified that Lane's counsel was "suspected" of security violations and engaged in "suspicious" behavior, namely, embracing her client at the beginning and end of each meeting (in a manner permitted by DOC policy), purchasing food for her clients, representing numerous inmates, and repeatedly visiting the institution. Yet, despite this testimony, neither Smith nor Harris testified that the refusal to allow Lane and his counsel to have contact visits in a private room related to this alleged "suspicious" conduct. In fact, Smith testified that Lane and his counsel are not treated differently from anyone else that uses the visiting area. (*Tr.*, 127:10-12.) Thus, the claimed "suspicious" behavior by Lane's counsel is simply irrelevant to Commonwealth Defendants' refusal to accommodate the request for confidential contact visits and presentation of such evidence was inappropriate.

Five exhibits related to this testimony were offered into evidence by Commonwealth

Defendants at the preliminary injunction hearing. (*Tr.*, Exs. 14-18.) These five exhibits were testified to by Smith. (*Id.* at 123:4-126:17.)   Each of these exhibits are still-frame photographs taken from a surveillance video of the general visiting area at SCI-Huntingdon, and they display Lane's counsel embracing an inmate, apparently the plaintiff in this litigation.   Of course, photographs of the visitation room depicting the accommodations available for inmate-attorney meetings at SCI-Huntingdon were probative of the issues raised in the preliminary injunction motion.   Commonwealth Defendants, however, offered these exhibits not as evidence of the accommodations available for inmate-attorney visits, but to demonstrate the "suspicious" activity engaged in by Lane's counsel.   Simply put, as Commonwealth Defendants did not present any evidence or argument that the refusal to provide confidential contact visits to Lane and his counsel was justified in light of this "suspicious" conduct, Commonwealth Defendants' use of these exhibits at the preliminary injunction hearing served no legitimate purpose, and the display of these photographs did not aid the resolution of any issue raised by Lane.   Intentional or otherwise, the inference drawn from the display of these exhibits by Commonwealth Defendants is that they were offered to embarrass and intimidate Lane's counsel.   Such conduct is unbecoming of a lawyer admitted to practice in this Court and is at odds with this District's Code of Professional Conduct. *See* M.D. Pa. L.R. App. C ¶ 2 ("I will treat with civility and respect the lawyers, clients, opposing parties, the court and all officials with whom I work.  Professional courtesy is compatible with vigorous advocacy and zealous representation."); *id.* at ¶ 8 ("I will not engage in conduct that brings disorder or disruption to the courtroom.").   Counsel for Commonwealth Defendants are therefore reminded of their obligations to comply with the District's Code of Professional Conduct, as well as the Pennsylvania Rules of Professional Conduct. *See* M.D. Pa. L.R. 83.23.2.

In sum, Lane's motion for a preliminary injunction will be denied because he fails to

demonstrate a reasonable probability that he will prevail on the merits of his access to the courts claim or that he will suffer irreparable harm in the absence of preliminary injunctive relief. In so holding that Lane is not entitled to a preliminary injunction, I need not, and have not, determined that Commonwealth Defendants' regulation relating to confidential contact visits between an inmate and his attorney at SCI-Huntingdon is constitutional, and the constitutionality of that regulation remains unanswered. Instead, I find only for purposes of the preliminary injunctive relief requested by Lane, in light of the evidence of record in this case, that he fails to satisfy his burden of demonstrating a reasonable probability that he will prevail on the merits of his access to the courts claim or that he will suffer irreparable harm if his motion is not granted.

## IV. Conclusion

For the above stated reasons, a preliminary injunction will not issue and Plaintiff Carlton Lane's motion for a preliminary injunction will be denied.

An appropriate order follows.


February 3, 2015
Date

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge