## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARLTON LANE, | : | CIVIL NO: 3:14-CV-00991 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Caputo) |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| CORRECTIONS, *et al.*, | : | |
| | : | (Magistrate Judge Schwab) |
| Defendants. | : | |

## <u>REPORT AND RECOMMENDATIONS</u>

In this prisoner litigation, the plaintiff, Carlton Lane ("Lane"), an inmate at SCI Huntingdon, raises claims pursuant to 42 U.S.C. § 1983 for alleged violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution. In addition, Lane raises a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 (the "RLUIPA"), 42 U.S.C. §§ 2000cc – 2000cc-2; Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12132; and Section 504 of the Rehabilitation Act (the "RA") of 1973, 29 U.S.C. § 794.  Pending before the Court is a motion to dismiss filed by defendant Joseph Tavares ("Tavares"). Our recommendations follow.[1]

---

[1]     Lane has since filed a summary judgment motion aimed at Tavares; however, the Court never had occasion to rule upon Tavares' motion to dismiss, addressing the pleading sufficiency of Lane's claims, before Lane's motion was filed.  Accordingly, out of fairness, we ordered that Lane's summary judgment

## I.   <u>Relevant Procedural History</u>.

Lane, through counsel, initiated this lawsuit on May 23, 2014, by filing a complaint along with the requisite filing fee.   *Doc.* 1.   In the complaint, Lane names the following six defendants: (1) Tavares, a Physician employed by Wexford Health Sources, Inc. ("Wexford"); (2) Paula Price ("Price"), a Registered Nurse employed by the DOC as a Corrections Health Care Administrator ("CHCA") at SCI Huntingdon; (3) Tabb Bickell ("Bickell"), the former Superintendent at SCI Huntingdon; (4) "Mr. Cook," employed by the DOC as a Unit Manager at SCI Huntingdon; (5) Christopher Oppman ("Oppman"), employed by the DOC as the Director of the Bureau of Health Care Services; and (6) the DOC, a public entity in Pennsylvania that receives federal funding.[2] Relevant here, Tavares is sued in his individual capacity.   On June 7, 2014, Tavares waived service.   *Doc.* 3.   On August 15, 2014, Tavares filed a motion to dismiss, *Doc.* 23, and on October 16, 2014, the motion officially became ripe for the Court's disposition.

---

motion would be stayed, solely as it relates to Tavares, until the Court decides the motion to dismiss. *Doc.* 120.

[2]   Collectively, we will refer to Price, Bickell, Cook, Oppman, and the DOC as the DOC Defendants.

II.    **Legal Standard.**

Tavares moves for dismissal of the claims raised against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Under Rule 12(b)(6), a district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff is entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)). While a complaint need only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions" are not enough, and a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

III.   **Lane's Complaint, *Doc.* 1**.[3]

### A. Lane's Health Problems.

Lane, who is now 58 years old, was shot in the abdomen nearly 38 years ago.  Lane's gunshot wound is noted in his prison medical records.  Since Lane was shot, he has experienced a loss of bladder control.  Lane manages this condition by using adult diapers known as "Depends."  Additionally, when Lane is hospitalized, he normally requires a bedpan and "hand-held urinal bottle."  *Doc.* 1 at ¶ 13.  For many years, Lane has not sought or received medical treatment for this condition.  According to Lane, however, his condition is "reflected" in his medical records, in that he is regularly provided with Depends.

With this condition, Lane normally gets up during the night in order to change into new Depends or to change bed sheets that have been soiled.  Consequently, Lane makes some noise during the night, and there is a smell that lingers when he has an incident.  Furthermore, there are no trash bins in the individual cells and plastic bags are considered contraband; thus, Lane has no means for stowing soiled sheets and Depends during the night.

In addition to losing control over his bladder, Lane, in recent years, has developed heart disease.  Lane, therefore, experiences chest pain and shortness of

---

[3]     Consistent with the Rule 12(b)(6) legal standard, *supra,* we accept Lane's properly pleaded allegations as though they are true.

breath after periods of minor exertion.  Regarding this particular disease, Lane's symptoms are episodic.  When he is symptomatic, though, Lane cannot climb a flight of stairs without having difficulties and feeling physically distressed.

### B. Issues Encountered at SCI Huntingdon, Stemming from Lane's Health Problems.

When Lane began serving his life sentence, and for many years thereafter, the DOC's usual practice was to house every life-sentenced prisoner in a single cell.  Accordingly, Lane occupied a single cell at SCI Graterford from 1979 until 2006.  Beginning in 2006, however, Lane was transferred to SCI Smithfield, where he was double-celled for a brief period until he was ultimately provided with a single cell.  Then, in December 2012, Lane was transferred to SCI Huntingdon.  Upon his arrival at SCI Huntingdon, Lane was placed in a double cell.  In Spring 2013, Lane requested a single cell, but his request was denied.

At the time Lane arrived at SCI Huntingdon, he was already nearing 60 years old, and was assigned to double cells with younger inmates.  "A series of [Lane's] cell mates" expressed their annoyance at the noise, odors, and clutter that tended to follow him because of his loss of bladder control.  Additionally, Lane was harassed and physically assaulted by his cell mates because of his bladder condition.  As a result, Lane found it difficult to read and write in his cell; to keep up his personal hygiene; to prepare snacks; to listen to music or watch television;

to wash clothes or clean the cell; or to nap during the daytime to catch up on missed sleep during the night.  Furthermore, because of the confrontations between Lane and his cell mates, he was subject to disciplinary sanctions, including, but not limited to punitive confinement in the Restricted Housing Unit ("RHU").

Regarding Lane's chest pain and coronary disease, Lane had formerly attended Friday Prayers with other Muslim inmates at SCI Graterford and SCI Smithfield.  Lane attended Friday Prayers on a regular basis.  At SCI Huntingdon, though, the Muslim worship services are solely held in the prison's chapel which can only be reached by climbing five flights of stairs.  Accordingly, Lane has had to forego Friday Prayers with his fellow Muslim inmates.  In addition, not long ago, on an undisclosed date, Lane fell backwards and injured himself when he experienced sharp chest pain while attempting to ascend the ladder to his upper-level bunk bed.  Lane's medical records document the fall as well as other occasions when he reported having sharp chest pain.

### C. Lane's Requests for Accommodations.

 Under DOC policy, assignment to a single cell is known as "Z-Code."  As mentioned, *supra,* in Spring 2013, Lane requested Z-Code status at SCI Huntingdon.  Lane's first written request for Z-Code status was reviewed by Cook and two non-defendants, who formed a review committee of sorts.  The two non-

6

defendants voted to recommend Lane for Z-Code status, while Cook voted the opposite.  Cook did not provide any reason for his vote.  In light of Cook's vote, Lane's initial request for Z-Code status was denied.

On June 11, 2013, after Lane's initial request for Z-Code status was denied, he wrote to Bickell to appeal the decision.  Lane did not hear back from Bickell or any other staff member.  Additionally, no one advised Lane of other formats for submitting a disability accommodation request such as the principle one *via* DC-ADM 006, "Reasonable Accommodations for Inmates with Disabilities."

Despite not being advised about other formats for submitting a disability accommodation request, on July 1, 2013, Lane submitted a DC-ADM 006 request, seeking Z-Code status.  In this request, Lane described his medical condition, namely his loss of bladder control and coronary disease, and explained the activities in which he wished to participate.  Lane also described his requested accommodations, which included: an assignment to a cell on the bottom tier; assignment to a single cell; and means to access Friday Prayers such as the installation of an elevator or by moving the chapel or transferring him to an institution with an accessible chapel.

On July 5, 2013, Price received and countersigned Lane's DC-ADM 006 request.  After four weeks passed without hearing anything, Lane submitted an

inquiry to Price on a Form DC-135A.  On August 1, 2013, Price answered the inquiry by noting: "Mr. Lane, the physician has been reviewing these cases[;] you should hear something very soon."  *Id.* at ¶ 58.

Around the time that Price responded to Lane's DC-135A form, Lane began experiencing back pain.  Lane, thus, requested to be seen at sick call to get treatment for his back. On August 5, 2013, Lane was seen by a Physician's Assistant for "chronic back pain."  *Id.* at ¶ 60.  As a result of the visit, Lane's prescription for Motrin was renewed.

The following morning, on August 6, 2013, Lane went to sick call again for back pain.  At this visit, Lane met with Tavares, who was an employee of Wexford, contracted to work at SCI Huntingdon.  The contract the DOC entered with Wexford, though, did not mention Title II of the ADA or any other ADA provisions.  The same contract also did not explicitly require Tavares' employer, Wexford, to inform its physician-employees about the statutory definitions of disability in the ADA or to train its physicians with regard to their reole in complying with DC-ADM 006.  Last, the same contract did not specifically include any provision for the DOC to monitor and enforce the compliance of Wexford's physicians with professional obligations arising from the ADA or DC-ADM 006.

At the August 6th sick-call visit, Tavares documented that Lane complained about back pain yet was "able to ambulate [without] problem." *Id.* at ¶ 62. Tavares also entered "several other notes" about the condition of Lane's spine. *Id*. at ¶ 62. Lane, however, did not discuss his loss of bladder control during this visit, primarily because "[the] condition had remained unchanged for many years, and the purpose of the sick-call visit was to seek treatment for acute back pain." *Id.* at ¶ 63. Furthermore, Tavares did not examine Lane for loss of bladder control or ask him about it during this visit, and there is nothing in Lane's medical records reflecting that Tavares evaluated him for it at any other time. Nevertheless, Tavares entered the following "marginal note" into Lane's medical records: "Ɵ BM Ɵ urine issues." *Id.* at ¶ 66. Lane avers that Tavares' note fell outside of the "regular" format for medical notes under DOC policy; thus, according to Lane, Tavares "improperly and deliberately" entered the "marginal note" into his medical records "to create a false record . . . ." *Id.* at ¶ 68. As well, Tavares had access to Lane's medical records, which contained "many references" to Depends. *Id.* at ¶ 69.

On August 9, 2013, three days after his sick-call visit with Tavares for back pain, Lane submitted a second "Inmate Disability Accommodation Request Form." The second form was "similar in context to the first, except that [Lane] crossed out the previous request for the installation of an elevator." *Id.* at ¶ 71. Price

countersigned and dated the form on August 12, 2013.  Lane, though, did not receive any response to either of his request forms within the time frame established by DC-ADM 006.  Consequently, on October 9, 2013, when Lane had still received no response he submitted another inquiry to Price on Form DC-135A.  Price responded to the inquiry: "[Lane], I completed this on 8/12/13 and forwarded it on."  *Id.* at ¶ 75.

According to Lane, on August 12, 2013, Price indeed submitted a memorandum that was addressed to Bickell, regarding Lane's request.  In said memorandum, Price stated, "[Lane] reports on his ADA request form that he is able to ambulate to the chapel."  *Id.* at ¶ 80.  No such statement, though, was included in any of Lane's requests.  Price also "implied" that Tavares had conducted an evaluation of Lane with respect to his alleged disabilities, *id.* at ¶ 81, even though no such evaluation had occurred, and that Lane's request was "not a proper ADA accommodation request."  *Id.* at ¶ 82.  In addition, Price stated that Lane had no medical limitations even though she had access to his medical records, which would have demonstrated otherwise.  Lane avers, therefore, that Price's statements were knowingly false.  *See id.* at ¶¶ 81-85.

DC-ADM 006 also sets forth procedures for Facility Managers, or Superintendents, to follow upon receipt of a disability accommodation request.  Bickell, however, allegedly did not conduct any review of Lane's requests, Price's

memorandum, or the relevant record, given that he forwarded Price's memorandum to Oppman the day after its submission. Based upon the same reasoning, Lane complains that Bickell also did not check the memorandum for accuracy or completeness.

DC-ADM 006 governs individuals such as Oppman as well, with respect to receiving disability accommodation requests. Moreover, the same policy sets forth membership requirements to constitute a "Central Office Inmate Disability Accommodation Committee" ("COIDAC"). According to Lane, *the DOC* did not properly constitute a COIDAC. Thus, in the absence of a COIDAC and any record that the relevant materials were reviewed by a COIDAC, Lane avers that Oppman, alone, handled Lane's accommodation request. Similarly, Lane avers that the DOC has no copy of any memorandum, from Oppman, or the COIDAC, to Bickell, outlining the determination of the COIDAC with regard to Lane's accommodation requests. Nevertheless, on November 4, 2013, Bickell, *via* memorandum, informed Lane that the COIDAC decided Lane did not have a disability. After receiving Bickell's memorandum, Lane appealed the decision by filing a grievance.

At no time was Lane provided with a hearing on his accommodation requests. The DOC also refused said requests without documenting any grounds

11

for a finding that the accommodations requested would threaten safety or security, or that the reason for said denials served any legitimate or compelling interests.

In denying his accommodations requests, Lane avers that the accommodations requested have been provided "routinely" to other prisoners who are similarly situated and similarly disabled. *Id.* at ¶ 110. Lane further avers that his requests were denied for "improper and arbitrary [reasons], including but not limited to [the defendants'] feelings of revulsion because of the nature of his disability, their racial animosity toward his African American heritage, their hostility toward his Islamic religious practice, or their retaliatory intent to discourage him and others from continuing the practice of assisting fellow prisoners to use the prison grievance process, DC-ADM 804." *Id.* at ¶ 111.

### D. Lane's Injuries.

Based on the aforementioned allegations, Lane claims that he had to forego Friday Prayers; he has been subjected to physical and verbal harassment by a series of unwilling cell mates; he has difficulty resting in his cell to make up for time lost time sleeping during the night; he has been subjected to misconduct charges and punitive sanctions because of the confrontations with his cell mates; he has suffered emotional distress; and continues to experience episodes of sharp chest pain and shortness of breath.

**E.  Counts and Relief Requested.**

In the complaint, Lane includes the following seven Counts:

1) **Count I (First Amendment)**: Lane claims that Tavares, Price, Bickell, Cook, and Oppman violated his First Amendment right to freely exercise his religion by intentionally interfering with his attempt to gain safe access to Friday Prayers, with deliberate indifference to his constitutional rights. *Id.* at ¶ 138.

2) **Count II (Eighth Amendment)**: Lane claims that Tavares, Price, Bickell, Cook, and Oppman violated his Eighth Amendment rights by intentionally interfering with his attempt to have his single-cell status reinstated, with deliberate indifference to his constitutional rights. Additionally, Lane claims here that the same defendants intentionally interfered with his attempt to avoid having to climb ladders or stairs to reach his bunk, with deliberate indifference to his constitutional rights. *Id.* at ¶¶ 141-42.

3) **Count III (Fourteenth Amendment)**: Lane claims that Tavares, Price, Bickell, Cook, and Oppman intentionally caused him to be deprived of "liberty interests" without constitutionally adequate due process by their refusal to comply with DOC policies, by actively interfering with those policies, and by blocking his attempts to use DOC policies and procedures to obtain requested accommodations. *Id.* at ¶ 145.

4) **Count IV (Fourteenth Amendment)**: Lane claims that Tavares, Price, Bickell, Cook, and Oppman intentionally violated his right to equal protection under the law by causing him to be denied procedures provided by DC-ADM 006, as well as accommodations that are "routinely" made available to other prisoners similarly situated, and by improperly discriminating against him because of the nature of his

13

disability or for "other wrongful motivations . . . ." *Id.* at ¶ 148.

5) **Count V (RLUIPA)**: Lane claims that the DOC, through the alleged actions of its employees, including the individually named defendants, substantially burdened his religious practices without having a compelling interest and without considering less restrictive ways to accomplish its interests. Lane further claims that the DOC, through the alleged actions of its employees, did not enact policies adequate to protect his statutory rights under RLUIPA, or, having enacted such policies, did not provide adequate enforcement and review procedures to ensure that the policies were effectively observed. *Id.* at ¶¶ 151-52.

6) **Count VI (ADA)**: Lane claims that the DOC, through the actions of its employees, including the individually named defendants, discriminated against him because of his disabilities and, therefore, excluded him from participating in programs, activities, and services for which he was qualified. Furthermore, Lane claims that the DOC omitted from its contract with Wexford any requirement that doctors must learn and comply with Title II of the ADA, which deprived Lane of competent medical assessment and rending his accommodation requests futile. *Id.* at ¶¶ 155-56.

7) **Count VII (RA)**: Lane claims that the DOC, through the actions of its employees, including the individually named defendants, discriminated against him because of his disabilities and, therefore, excluded him from participating in programs, activities, and services supported, in part, by federal funding. *Id.* at ¶ 159.

In light of these claims for relief and the allegations provided in the complaint, Lane seeks compensatory and punitive damages, declaratory relief, costs, and attorney's fees.

## IV.   **Discussion.**

In the complaint, Lane's federal claims against Tavares are pleaded as constitutional claims brought under 42 U.S.C. § 1983.  In pertinent part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors." *Pappas v. City of Lebanon*, 331 F.Supp.2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002)). To establish a claim under § 1983, a plaintiff must show that (1) the conduct complained of was committed by persons acting under color of state law and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

Tavares does not take issue with Lane's pleaded § 1983 claims insofar as there are sufficient allegations plausibly showing that he is a state actor.  Tavares, instead, takes direct aim at those claims in moving for their dismissal.[4]

---

[4]    Tavares first moves for the dismissal of all the claims raised against him on the basis that, despite being plead in constitutional terms, they are actually claims seeking to impose individual liability for violations of Title II of the ADA. *See Docs.* 24 at 3-10 & 30 at 1-2; *see also, George v. Pennsylvania Department of Corrections*, No. 09-1202, 2010 WL 936778, at *7 (M.D. Pa. Mar. 11, 2010)(recognizing, *inter alia,* that individuals cannot be sued under Title II of the ADA); *Carpenter v. Kloptoski,* No. 08-2233, 2013 WL 1410390, at *3 (M.D. Pa. Apr. 8, 2013)(same).  In opposition to Tavares' argument, Lane suggests that the Court simply disregard it because the pleaded constitutional claims are "distinct and independent" even though they arise from common facts.  *Docs.* 29 at 4 & 45 at 9-10.

In conducting our own research on this seemingly important issue, since the parties have not provided us with cases on point, we discovered that a uniform majority of federal courts have indeed concluded that § 1983 cannot be used to remedy violations of the ADA, which contains its own remedial scheme.  *See Taylor v. Altoona Area School District*, 513 F.Supp.2d 540, 562 (W.D. Pa. Aug. 23, 2007)(collecting cases); *see also, George v. New York City Transit Authority*, No. 13-7986, 2014 WL 3388660, at *3 (S.D.N.Y. July 11, 2014)("Courts have uniformly held that the ADA's comprehensive remedial scheme precludes Section 1983 claims predicated on ADA violations.")(citing as examples, *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002), *Bartlett v. New York State Board of Law Examiners*, 970 F.Supp. 1094, 1144-45 (S.D.N.Y. 1997)(Sotomayor, J.), *aff'd in part and vacated in part on other grounds*, 156 F.3d 321 (2d Cir. 1998)); *but see, Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 281 (7th Cir. 2003)("Our court . . . has consistently declined to find that other similar statutes preclude § 1983 relief when the § 1983 claim is based directly on a constitutional violation, not a statutory one.")(citing *Trigg v. Fort Wayne Community School*, 766 F.2d 299 (7th Cir. 1985)).  In reading these cases, however, it is unclear whether the same proposition applies to the situation we presently encounter, where Lane does not specifically use the ADA as a predicate to recover under § 1983, but may impliedly be doing the same.  Furthermore, it

## A. Count I.

In Count I, Lane claims that Tavares violated his First Amendment right to freely exercise his religion by intentionally interfering with his (Lane's) attempt to gain safe access to Friday Prayers.  The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. CONST. amend. I.   In *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), the Supreme Court held that the First Amendment was incorporated by the Fourteenth Amendment and, thus, applicable to the states. Although Lane is imprisoned, the Supreme Court has made clear that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). To a degree, therefore, "[i]nmates clearly retain protections afforded by the First Amendment . . . including its directive that  . . .  the free exercise of religion [shall not be prohibited]." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987)(citations omitted).

With respect to the Free Exercise Clause, "[it] is [generally] violated when the government has 'placed a *substantial burden* on the observation of a central religious belief or practice' and no 'compelling governmental interests justifies the

---

does not appear that the Third Circuit has ruled on the issue with which we are presented, and, in the absence of adequate briefing from the parties, we recommend that the Court defers ruling on this issue.

burden.'" *Torres v. Davis*, 506 F. App'x 98, 101 (3d Cir. 2012)(quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989))(emphasis added).  Whereas here, however, Lane has raised a First Amendment free exercise claim on the basis of intentional targeting (or interference) by government actors, there is no need to show the existence of a "substantial burden" because "[a]pplying such a burden test . . . would make petty harassment of religious . . . exercise immune from the protection of the First Amendment." *Brown v. Borough of Mahaffey, Pennsylvania*, 35 F.3d 846, 849-50 (3d Cir. 1994).  Accordingly, Lane must only show that a government actor intentionally discriminated against a religious exercise.  *See Mack v. Yost*, 979 F.Supp.2d 639, 651 (W.D. Pa. 2013).  Furthermore, even in the prison environment, "[w]hen the government intentionally discriminates against [a] religious exercise, no balancing test is necessary; rather, 'strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest.'" *See id.* (quoting *Tenafly Eruv Association v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002)(citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 542 (1993)).

Here, the allegations in the complaint do not plausibly show that Tavares intentionally interfered with Tavares' religious exercise, i.e., Friday Prayers. While Lane avers that Tavares "improperly and deliberately" falsified the medical

18

records "to create a false record," and that he (Tavares) allegedly took said action due to "hostility toward [Lane's] Islamic religious practice," *Doc.* 1 at ¶ 111, the allegations of religious hostility are conclusive.  Nowhere in the complaint, for example, does Lane set forth that Tavares, on the date in question, made a statement or comment about his religious exercises, or that Tavares was known for discriminating against followers of Islam.  Indeed, Lane does not even allege that he spoke to Tavares on the date in question about his religion, his religious exercises, or his requests for accommodations to attend Friday Prayers.  Thus, even assuming Tavares was aware of Lane's accommodations requests and "improperly and deliberately" falsified the medical records, we cannot say it is plausible that he acted with the intention of interfering with Lane's access to, or ability to participate in, Friday Prayers.  Count I should therefore be dismissed against Tavares without prejudice.

## B. Count II.

In Count II, Lane claims that Tavares violated his Eighth Amendment rights by intentionally interfering with his attempt to have his single-cell status reinstated, with deliberate indifference to his constitutional rights.  Additionally, Lane claims here that Tavares intentionally interfered with his attempt to avoid having to climb ladders or stairs to reach his bunk, also with deliberate indifference to his constitutional rights.

The Eighth Amendment, in pertinent part, guarantees the right to be free from cruel and unusual punishment inflicted by the Government. *See* U.S. CONST. Amend. VIII. "The primary concern of the drafters [of the Eighth Amendment] was to proscribe 'torture(s)' and other 'barbar(ous)' methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). In the 20th Century, however, the Supreme Court held that the Amendment proscribes more than physically barbarous punishments "embod[ying] 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency…,' against which [federal courts] must evaluate penal measures." *Id.* (Citations omitted). Thus, the Supreme Court has since held repugnant to the Eighth Amendment "punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society … or which involve the unnecessary and wanton infliction of pain." *Id.* (quoted cases omitted).

In light of these elementary principles, claims raised under the Eighth Amendment are generally said to include an objective and subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *but see Brooks v. Kyle*, 204 F.3d 104, 108 (3d Cir. 2000)(explaining that in the excessive force context there is no objective component). The objective component is normally contextual and responsive to "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The subjective component on the other hand follows from the

principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson*, 501 U.S. at 297); *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981). What is necessary to establish an unnecessary and wanton infliction of pain varies according to the nature of the Eighth Amendment claim. *Hudson,* 503 U.S. at 5.

The combination of the objective and subjective components typically make up the oft-cited "deliberate indifference" standard. "Deliberate indifference describes a state of mind more blameworthy than negligence." *Farmer,* 511 U.S. at 835. To establish deliberate indifference, a plaintiff must plausibly show that a prison official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that the official drew the inference. *Id.* at 837. Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not … cannot … be condemned as the infliction of punishment." *Id.* at 838.

Here, we do not find persuasive Tavares' argument that Lane's primary basis for bringing this claim against him, i.e., the alleged falsification of medical records, inherently calls for the dismissal of the Eighth Amendment claim. *See Doc.* 30 at 3-4. To that end, Lane's claim is that the alleged falsification played a significant role in the denial of his accommodations requests, not that the alleged falsification alone amounts to an Eighth Amendment violation. *Compare Rivera v.*

*Tennis*, 09–0888, 2010 WL 2838603 (M.D. Pa. May 20, 2010) (finding allegations of falsifying medical records without explanation as to how the falsification affected medical treatment insufficient to state a § 1983 claim for Eighth Amendment violation), *with Curbeam v. Montgomery Cnty. Corr. Facility*, 12–2309, 2013 WL 315719 (E.D. Pa. Jan. 28, 2013) (complaint alleging that nurse falsely recorded that plaintiff did not want medical treatment causing a 21–day delay in treatment stated a § 1983 claim for Eighth Amendment violation).

At the same time, as we read the allegations in the complaint, Lane's alleged bladder control issues were not the reason he wanted a lower-level bunk or to avoid having to climb stairs throughout the prison; instead, it was because he had allegedly developed heart disease, which inhibited his ability to ascend ladders and stairs. *See Doc.* 1 at ¶ 142.  Lane does not allege, however, that Tavares falsified information relating to that disease or his ability to ambulate "[without] problem." *Id.* at ¶ 62. Rather, the allegations of falsification are aimed solely, and specifically, at Tavares' medical notes relating to bladder control issues. *Id.* at ¶¶ 66-69.  Additionally, the sole purpose of the sick-call visit was to evaluate Lane for complaints about back pain, and Lane does not assert that he otherwise made comments about his heart condition during the same visit or that Tavares asked him about the condition, to which no notes were entered.  Thus, in this context, it is implausible to suggest that Tavares interfered with Lane's attempt to obtain

22

accommodations to avoid having to climb ladders or stairs to reach his bunk or navigate throughout the prison, because of the alleged falsification of medical records; medical records that apparently made no mention about Lane's heart condition. *See also, Doc.* 29 at 9 (explaining, without explicitly stating, that the Eighth Amendment claim is premised upon the alleged falsification of medical records, not any alleged failure by Tavares to conduct an evaluation of Lane's alleged heart disease).

This leaves us with Lane's claim that Tavares violated his Eighth Amendment rights by intentionally interfering with his attempt to have his single-cell status reinstated, *via* his accommodations requests, with deliberate indifference to his constitutional rights. Lane's desire for single-cell status, as we read the complaint, is directly linked to his alleged bladder control issues.

Again, here, Lane relies upon the medical notes Tavares allegedly entered during the sick-call visit related to his complaints about back pain. At this visit, Lane alleges that he did <u>not</u> discuss his bladder control issues. *Doc.* 1 at ¶ 63. Lane, however, also does <u>not</u> allege that he discussed any of the following with Tavares: his accommodations requests; his desire for a single-cell because of bladder control issues; or problems he had encountered (or was encountering) with cell mates because of the same health issue. Further, Lane does <u>not</u> allege that Tavares had been made aware of, seen, or reviewed the accommodation requests

before the sick-call visit.[5]  As well, there are no allegations suggesting that Tavares knew, or was aware, that his notes from the sick-call visit would be used to resolve Lane's accommodation requests about entirely separate health problems.  Finally, insofar as it is still necessary to discuss, Lane's allegation that the medical records were falsified because of Tavares' alleged hostility, animosity, revulsion, and retaliation toward Lane is conclusive.

In sum, no plausible showing has been presently made that Tavares entered the alleged "marginal note" with the intention of derailing his (Lane's) accommodation requests, i.e., his attempts to obtain single-cell status.[6] Accordingly, given the allegations in the complaint, coupled with what Lane fails to allege, we find that there has been no plausible showing that Tavares possessed the requisite *scienter* to be held liable for violating the Eighth Amendment.

---

[5]    Lane alleges that Price answered his DC-135A inquiry on August 1, 2013, by noting: "[Lane], *the physician* has been reviewing these cases . . . ." *Doc.* 1 at ¶ 58 (emphasis added).  Lane fails to show, however, that Tavares was "the physician" referred to in Price's response.  Indeed, Lane refers to Tavares merely as 'a' physician employed by Wexford, who worked at SCI Huntingdon during the time relevant to this action.  *See id.* at ¶ 4; *see also, generally, McFadden v. United States*, No. 14-378, 2015 WL 2473377, at *4 (June 18, 2015)("When used as an indefinite article, 'a' means '[s]ome undetermined or unspecified particular.'")(citing Webster's New International Dictionary 1 (2d ed. 1954)).

[6]    The same holds true with respect to Lane's requests for a bunk on a lower tier or for easier access throughout the prison.

24

Count II consequently should be dismissed without prejudice, in its entirety, against Tavares.

## C. Count III.

Lane claims that Tavares intentionally caused him to be deprived of "liberty interests" without constitutionally adequate due process, in violation of the Fourteenth Amendment, through his refusal to comply with DOC policies, by actively interfering with those policies, and by blocking his (Lane's) attempts to use DOC policies and procedures to obtain requested accommodations. *Doc.* 1 at ¶ 145.

The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that a state shall not "deprive any person of . . . liberty . . . without due process of law. . . ." U.S. CONST. amend. XIV, § 1. Due process under the Fourteenth Amendment has both "substantive and procedural components." *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 658 (3d Cir. 2011). It is unclear in this case under which component Lane proceeds, or if he is proceeding under both components. Nevertheless, Lane does not dispute Tavares' assertion, *Doc.* 24 at 13, that the claim solely arises under the procedural component; therefore, we will treat the claim accordingly.

In its essence, procedural due process is the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976).  To state a claim for a "deprivation of procedural due process . . . a plaintiff must allege that: (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property;' and (2) the procedures available to him did not provide 'due process of the law.'"  *Hill v. Borough of Kutztown*, 445 F.2d 225, 233–34 (3d Cir. 2006).  Lane asserts that he has protected liberty interests.

> [T]he Supreme Court has "reject[ed] ... the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Jago v. Van Curen*, 454 U.S. 14, 17 (1981) (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976)) (internal quotation marks omitted). Instead, our inquiry concerns "not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property language of the Fourteenth Amendment.'" *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Protected liberty interests "arise either from the Due Process Clause or from state-created statutory entitlement." *Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir. 2002) (quoting *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000)). We have characterized the former as an "independent due process liberty interest" and the latter as a "state-created liberty interest." *Renchenski v. Williams*, 622 F.3d 315, 325 (3d Cir. 2010).

*Powell v. Weiss*, 757 F.3d 338, 341 (3d Cir. 2014)(emphasis in original).

The DOC policies at issue here, primarily DC ADM 006, do not endow Lane with a liberty interest under the Fourteenth Amendment.  *See Evans v. Rozum*, No.

07-230J, 2008 WL 5068963, at *13 (W.D. Pa. Nov. 24, 2008)("As to the failure of the Defendants to follow the procedures outlines in DOC policies for addressing accommodation requests, such fails to state a claim of procedural due process because the procedures set up by the DOC do not endow Plaintiff with a liberty . . . interest under the Fourteenth Amendment, requiring the DOC to abide by its own procedures."); *see also, Rambert v. Beard*, No. 09-634, 2012 WL 760619, at *13 (M.D. Pa. Mar. 7, 2012)("[F]ailure to follow DOC policy does not, in and of itself, result in a violation of due process.")(citations omitted); *accord, Hoover v. Watson*, 886 F.Supp. 410, 418 (D. Del.) *aff'd*, 74 F.3d 1226 (3d Cir. 1995)(holding that if a state elects to provide a grievance mechanism, violations of its procedures do not give rise to a § 1983 claim).

Lane nonetheless presses in his brief-in-opposition that, through the allegations in the complaint, he has otherwise shown the existence of (1) independent and (2) state-created liberty interests.  In support thereof, Lane relies upon the tests applied in *Powell*, 757 F.3d at 342-44, 344-36.  *Doc.* 29 at 10-11.

> With respect to an inmate's independent due process liberty interest, the Supreme Court has held:
>
> As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.

> *Montanye v. Haymes*, 427 U.S. 236, 242 (1976); *Asquith v. Dep't of Corr.*, 186 F.3d 407, 410 (3d Cir. 1999). Thus, due process is implicated "when severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing." *Renchenski*, 622 F.3d at 325 (finding that due process must be afforded before sex offender conditions may be imposed on an inmate who was not convicted of a sexual offense); *see also Vitek v. Jones*, 445 U.S. 480, 487 (1980) (holding that a prisoner convicted of robbery may not be involuntarily transferred to a mental hospital without process).

*Powell,* 757 F.3d at 342.

While we do not doubt that, if his allegations are actually true, Lane may encounter difficulties, and even confrontations, as a result of his medical conditions, we find he has not plausibly shown that the conditions or degree of his confinement fall outside the sentence imposed upon him or are otherwise unconstitutional. Indeed, "living in a double cell is an expected ordinary incident of prison life" and there is no due process violation if a Z-Code status is removed without a meaningful opportunity to be heard. *See Carpenter v. Kloptoski*, No. 08-2233, 2012 WL 911558, at *3 (M.D. Pa. Mar. 16, 2012). As well, overall, compared to the inmate-plaintiffs in *Vitek* and *Renchenski*, *supra*, Lane's conditions in prison have not "severely" changed such that he suffered any grievous loss. Furthermore, Lane's assertion that he has a protected liberty interest in attending Friday Prayers, which was allegedly interfered with by Tavares, *via* the DOC policies, makes his First Amendment claim redundant, qualifying the due

28

process claim for dismissal.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (providing that where a specific Amendment "provides an explicit textual source of constitutional protection" against a particular sort of governmental conduct, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims").

We similarly find that Lane fails to show a state-created liberty interest pursuant to *Sandin v. Conner*, 515 U.S. 472 (1995): a seminal Supreme Court case also discussed in *Powell*.

> In [*Sandin*], the Supreme Court held that a prisoner is deprived of a state-created liberty interest if the deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484; *see also Shoats*, 213 F.3d at 143 (adopting *Sandin*). In this inquiry, we do not compare the prisoner's own life before and after the deprivation. Rather, "[t]he baseline for determining what is 'atypical and significant'—the 'ordinary incidents of prison life'—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." *Asquith,* 186 F.3d at 412 (quoting *Griffin v. Vaughn*, 112 F.3d 703, 706 & n. 2 (3d Cir. 1997)).

*Powell,* 757 F.3d at 344.

Again, we understand and appreciate the doubtless difficulties Lane may experience, in addition to the encounters he may face, given his alleged medical conditions; however, we are not persuaded that the allegations show the existence of any significant or atypical hardship on Lane in relation to the ordinary incidents

of prison life.  We specifically reiterate that "living in a double cell is an expected ordinary incident of prison life" and there is no due process violation if Z-Code status is removed without a meaningful opportunity to be heard.  *Carpenter, supra,* 2012 WL 911558, at *3.

In light of our findings, we recommend that Count III be dismissed without prejudice.

### D. Count IV.

Lane claims that Tavares intentionally violated his right to equal protection under the law, in violation of the Fourteenth Amendment, by causing him to be denied procedures provided by DC-ADM 006, as well as accommodations that are routinely made available to other prisoners similarly situated, and by improperly discriminating against him because of the nature of his disability or for "other wrongful motivations . . . ." *Id.* at ¶ 148.

The Equal Protection Clause of the Fourteenth Amendment requires all persons "similarly situated" to be treated alike. *See City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Millard v. Hufford*, 415 F. App'x 348, 349 (3d Cir. 2011). A petitioner who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination that had a discriminatory effect on him. *See McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).  Accordingly, to state a claim under 42 U.S.C. § 1983 for a violation of the

30

Equal Protection Clause of the Fourteenth Amendment, a plaintiff must show that: (1) he was a member of a protected class; (2) he was treated differently from similarly situated persons outside of his protected class; and (3) the discrimination was purposeful or intentional rather than incidental. S*ee Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009); *see also Tillman*, 221 F.3d at 423–24.

Here, Lane's stated equal protection claim most obviously fails on the third element. Lane's allegation that Tavares discriminated because of his (Lane's) race, religion, or disability, *see Doc.* 1 at ¶ 111, is pure conjecture. Nowhere in the complaint is this allegation supported so as to give rise to a plausible inference of discriminatory animus. Accordingly, Count IV should be dismissed without prejudice.

## V.    Recommendations.

Based on the foregoing, **WE RECOMMEND** that Tavares' motion to dismiss (*Doc.* 23) be **GRANTED**, Counts I – IV in the complaint (*Doc.* 1) be **DISMISSED** without prejudice against Tavares, and a determination on whether Lane should be granted leave to amend be **DEFERRED** until the two pending summary judgment motions are resolved.  The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen  (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **22nd** day of **June 2015**.

*S/ Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge